# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MAY 22, 2008
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2007-SC-000162-MR

DATE 6-12-08 En A Grau.H P.C.

TIMOTHY P. HEIL                                                                    APPELLANT

V.
ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE STEPHEN K. MERSHON, JUDGE
NO. 05-CR-002767

COMMONWEALTH OF KENTUCKY                                        APPELLEE

## MEMORANDUM OPINION OF THE COURT

## REVERSING AND REMANDING

Timothy Heil appeals as a matter of right from a January 25, 2007 Judgment of the Jefferson Circuit Court convicting him of first-degree wanton endangerment and first-degree stalking. In accord with the jury's recommendation, the trial court sentenced Heil as a second-degree persistent felon to two consecutive ten-year terms of imprisonment.[1] The Commonwealth accused Heil of stalking his estranged wife, Lori Heil, and of wantonly endangering Lori's friend, Channin Daugherty. Heil contends that the improper admission of extensive evidence of collateral bad acts, a stalking instruction not supported by the evidence, and a non-unanimous verdict on the stalking offense denied him a fair trial. We agree that collateral evidence of an uncharged crime and a non-unanimous verdict with respect to the stalking charge entitle Heil to relief.

---

[1] Heil was also found guilty of third-degree terroristic threatening, for which he was sentenced to one day in jail, and he was acquitted of menacing.

## RELEVANT FACTS

The Heils were married in July 1993 and made their home in Charlestown, Indiana. Lori brought a daughter to the union, K. H., whom Tim adopted. The couple also had three sons together. Lori testified that in the fall of 1993, when she was pregnant with the first boy, she and Tim engaged in one of the arguments that came to characterize their relationship. During the argument Tim pushed her so hard that she fell. The fall knocked the breath out of her, necessitated a stay in the hospital so that her pregnancy could be monitored, and caused her deep concern for the child's well being. Thereafter, Lori testified, Tim's anger became one of the constants of the marriage. When he was angry, Lori said, Tim would break things. At different times he broke chairs, kicked or punched holes in the wall, and once he broke the footboard of a bed.

Lori and Channin Daugherty both testified about one of Tim's angry outbursts that occurred in January 1996, when the Heils had invited Channin; her husband, Michael; and their children to the Heilses' home for a birthday party. Lori and Michael had been friends since childhood, she and Channin worked together, the couples attended the same church, and their children were friends and participated in many of the same activities. On this occasion, however, a disagreement between Channin and Tim caused Tim to fly into a rage. He loudly insisted that the Daughertys get out of his house, he pushed Channin, and he tried to start a fight with Michael. Concerned neighbors summoned the police, and the next day Channin obtained a protective order against Tim. The upshot was a permanent rift between Tim and the Daughertys. For some time he insisted that Lori and the children have nothing to do with them, and even

2

when contact was eventually resumed he remained disapproving.

The Commonwealth sought to introduce another fact from the early years of the marriage. In 2000 Tim was convicted in Indiana for having molested, in 1995, one of the Heilses' babysitters. This evidence, however, the trial court excluded.

Notwithstanding the arguments and the tensions arising from Tim's anger, Lori testified that the marriage remained functional until about 2004, when Tim began insisting on virtually complete control over her. He monopolized the couple's finances and financial records and began demanding that Lori account for her whereabouts whenever she was away from home. This scrutiny became more and more oppressive and occasioned seemingly constant arguing. Following an outburst in December 2004, she and the children were trying to get out of the house when Tim pushed K. H. down the steps and grabbed Lori around the throat. Matters came to a head in the summer of 2005. Lori testified that one evening she was going to be late getting home and so she left a somewhat sarcastic message on Tim's voice-mail to the effect that she was reporting in as required. When she arrived home, she found vegetables—a gift from a neighbor's garden—thrown and smashed all over the kitchen.

That was the last straw. With Channin Daugherty's help Lori contacted a divorce attorney and tried to figure out if there was any way she and the children could afford to separate from Tim. In late July 2005, Lori told Tim that if she could afford it she would proceed with a divorce immediately. Tim warned her that his children would never spend the night in a house with another man. On July 31, 2005, Tim found in Lori's car a list of questions in Channin's handwriting for the divorce attorney. He confronted Lori with the list and demanded to know who had written it. They argued about the list and

3

they also argued over K. H.'s birthday party. K. H. was turning fourteen and was to have a pool party that afternoon at her aunt's house. Tim wanted to attend, but Lori felt it would be inappropriate for him to attend a party for adolescent girls. The trial court correctly excluded any mention of Tim's conviction as a reason for Lori's feeling. In addition to the party, Lori, a musician, was scheduled to perform at a wedding that night. As she and the children were preparing to leave, Tim blocked her in a closet and told her that after the party and the wedding she should leave the children with relatives and come home alone so that they could have out their differences "once and for all." Lori testified that his manner and his ultimatum terrified her. She feared that she could not safely return home. After the wedding she obtained some money from her father, and then she, her children, the Daughertys, and their children drove to a Louisville restaurant to eat and to find a shelter for Lori and her children.

Channin Daugherty testified that she was the first to finish eating and that because their various cell phones all needed charging, she took Lori's cell phone to Lori's van where there was a charger. She was sitting in the van talking to a staff member of a shelter when Tim appeared at the window and furiously demanded to know where Lori was. Hoping to lead him away from the others, Channin gestured away from the restaurant and, with Tim pounding on the window, backed the van out of its parking space and pulled into traffic. Tim followed her in his truck. According to Channin, he repeatedly tried to force her to the side of the road and finally succeeded in forcing her onto the median. She escaped again, however, when he got out of his truck, and in the meantime she called 911. The emergency operator contacted police officers. When Tim finally abandoned his pursuit, Channin returned to the restaurant

4

and told the others and the police what had happened. The police arranged for all of them to spend the night at a Louisville motel and took measures to ensure that they were not followed as they drove there. Soon after they arrived, there began a nightlong barrage of phone calls from Tim. They did not answer those calls, but knew that Tim was calling through caller identification. Phone records confirmed that Tim had called each of their cell phones numerous times into the early morning, and that he began calling again soon after sunrise. Phone records and other witnesses also indicated that during the night of July 31, 2005 and for several days thereafter Tim made repeated calls to Lori's friends, acquaintances, and family members and several times threatened that if Lori did not contact him he would destroy her belongings and leave her with nothing.

The next morning, Lori and the Daughertys planned to go directly to the Jefferson County Judicial Center to apply for protective orders, but when they went to the motel's parking lot Lori's van was missing. Because Tim was the only other person with a key to the van, they inferred that he had taken it, and it frightened them that he knew where they were despite police assurances that he had not followed them. Lori did obtain a protective order, which was served on Tim the next day, August 2, 2005. Channin, too, applied for a protective order and also filed charges against Tim for terroristic threatening and wanton endangerment. Both families continued to hide for several days. On about August 6, 2005, as testified to by Michael Daugherty and confirmed by Ron Harmon, an official and acquaintance from the couples' church, Harmon called Michael to warn him that he had just accompanied an apparently suicidal Tim to the hospital and that en route Tim had expressed a frightening degree of

5

anger toward the Daughertys and a desire to harm them. On about August 8, 2005, Tim appeared at the hearing on Lori's motion for a domestic violence order, and at the conclusion of the hearing he was arrested on the charges filed by Channin.

The next day Lori was able to return to her Charlestown residence. She found the house in disarray. Although the children's rooms and belongings were not disturbed, the contents of drawers and closets were strewn about the rest of the house. Most of Lori's clothes, family records, and other items of particular value to her were missing. She found an axe on her bedroom floor. Her van was not at the house. The next day one of her sons showed her a small television monitor concealed in the basement. The monitor showed K. H.'s bedroom. Lori summoned Charlestown police officers, and in addition to a clock-radio with a hidden camera in K. H.'s room, they found a device for recording phone conversations.

K. H. then revealed to Lori, as K. H. testified, that sometime in 2004 Tim had begun harassing her in sexual ways. Once while she was sleeping on the couch he had awakened her by placing his hand inside her shirt on her breast. He frequently came into her room and watched her change clothes. She had been awakened several times during the night by what she believed was the sound of his masturbating in her doorway, and on other occasions she had awakened and found semen on her face. Once, not long before July 31, he had appeared fully naked before her and urged her to "wrestle." When she ran to her room and locked the door, he pounded on it, threatening to break it down and to "fuck" her. He warned her not to tell anyone, because her brothers would hate her for getting him in trouble. These allegations gave rise to criminal charges in Indiana.

6

Later in August, Lori, who was still without her van, found stored in Tim's truck account records from a satellite tracking service. She was able to access the account on the internet and discovered that soon after July 23, 2005 Tim had installed a monitoring device in her van which enabled him to track the van's location through his e-mail account. The last record of the van's position was from August 2, 2005 on Brim Drive in Jeffersonville. Lori drove up and down Brim Drive, but did not locate the van. It was another month, near the end of September 2005, before one of Tim's acquaintances who lived on Brim Drive phoned Lori and revealed that early in August she had, at Tim's behest, helped him move the van to the Executive Inn parking lot in Louisville, which is where Lori found it. The same acquaintance was also able to return some of Lori's records and other belongings.

On September 15, 2005, a Jefferson County grand jury indicted Tim on charges of wantonly endangering Channin Daugherty, of stalking Lori, of making a terroristic threat against the Daughertys, and of menacing Lori. By virtue of his 2000 conviction, he was also alleged to be a second-degree persistent felon. Prior to trial, the Commonwealth gave notice pursuant to KRE 404(c) that it intended to introduce evidence of Tim's prior crime and of his alleged bad acts throughout the marriage. With the sole exception of the prior conviction, the trial court agreed with the Commonwealth that all the evidence summarized above was admissible inasmuch as it tended to show Tim's and Lori's states of mind on July 31, 2005 and during the early part of August. Tim contends that much of the Commonwealth's proof had little or no relevance to the crimes charged, but was introduced merely to impugn his character, and that the trial court thus abused its discretion by admitting it. In particular he objected before and at

7

trial to the evidence of his alleged spying on and abuse of K. H.; to the evidence of the 1996 incident involving the Daughertys; and to all the evidence of prior threatening behavior against Lori, including the 1993 pushing incident, the property damage, the incident during which he allegedly pushed K. H. and grabbed Lori, and the incident involving the smashed vegetables. Although the admission of most of this evidence was within the trial court's discretion, we agree with Tim that the evidence regarding the alleged abuse of K. H. was unduly prejudicial. Its admission necessitates a new trial.

## ANALYSIS

### I. Some, but not all, of the Prior-Bad Acts Evidence should have been Excluded.

As the parties correctly note, evidence of a defendant's "other crimes, wrongs, or bad acts" is not admissible as proof of the defendant's character or of his propensity to break the law. KRE 404(b), however, permits the introduction of such evidence

> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

This rule is to be applied cautiously, we have explained, in accord with its fundamental purpose of "prohibit[ing] unfair inferences against a defendant." Anderson v. Commonwealth, 231 S.W.3d 117, 120 (Ky. 2007).

To be admissible under the rule, the evidence of other criminal or wrongful acts must be (1) relevant for some purpose other than to prove criminal predisposition, (2) sufficiently probative to warrant introduction, and (3) sufficiently probative so that its probative value outweighs its potential for prejudice to the accused. *Id.*; Bell v.

<u>Commonwealth</u>, 875 S.W.2d 882 (Ky. 1994). In other words, the alleged prior wrong must be relevant to a contested element of the charged crime, and the prior bad act evidence must be probative in two senses. First, it must be probative that the prior wrong did in fact occur. This requirement is satisfied "if the jury could reasonably conclude that the act occurred and that the defendant was the actor." <u>Davis v. Commonwealth</u>, 147 S.W.3d 709, 724-25 (Ky. 2004). Second, the evidence must also be sufficiently probative of an element of the charged crime to withstand the KRE 403 balancing test between probative value and prejudicial effect, with the assumption, moreover, that prior bad act evidence is inherently prejudicial and should be excluded absent a sufficiently strong countervailing need for it. <u>Anderson v. Commonwealth</u>, <u>supra</u>. We review the trial court's application of this balancing test under the abuse-of-discretion standard. <u>Davis v. Commonwealth</u>, <u>supra</u>.

## A. Evidence that Tim Spied Upon and Abused K. H. should not have been Admitted.

Tim first challenges the relevance and probativeness of the evidence that he spied upon and abused K. H. With respect to relevance, the Commonwealth maintains that the abuse evidence is relevant to Tim's state of mind, which is an element of both wanton endangerment (wantonness) and stalking (intention). According to the Commonwealth, Tim was desperate to prevent the discovery of his acts toward K. H. and thus desperate to maintain control over his family. That desperation led him to disregard the serious risk of injury to which he exposed Channin Daugherty and to purposefully engage in a course of conduct meant to frighten Lori into staying with him. We agree that his abuse of K. H. would doubtlessly have affected Tim's state of mind during the period in question and so was relevant to that issue.

We also agree that the abuse evidence—K. H.'s testimony and the damningly corroborative evidence of the hidden camera—were sufficiently probative that the abuse occurred. We are persuaded, however, that the trial court abused its discretion by admitting evidence with a grossly prejudicial effect which far outweighs its probative value. It is true, as the Commonwealth observes, that evidence of a prior wrong may be admitted when the prior wrong clearly provides a motive for the charged crime and thus offers substantially probative evidence of the culprit's identity and state of mind. In Price v. Commonwealth, 31 S.W.3d 885 (Ky. 2000), for example, Price was accused of murdering his estranged wife. Evidence that he had sexually abused his step-daughter was deemed admissible where it was also shown that shortly prior to the killing the murder victim had discovered the abuse and reported it to authorities, thereby denying Price access to the step-daughter and exposing him to prosecution. The abuse evidence, the Court explained, was thus inextricably bound up with Price's motive for the killing.

In this case, however, the connection between the alleged abuse and the crimes charged was nowhere near so inextricable or so clearly established. On the contrary, the evidence tended to show that, entirely apart from the alleged abuse, Tim disliked the Daughertys and resented what he perceived as their meddling in his marriage, and he had habitually used intimidation against Lori in his attempts to control her. While fear of discovery may have joined with Tim's anger and desire for dominance in bringing about his actions in late July and early August 2005, there was no evidence in this case, unlike Price, that Lori had discovered the abuse or that Tim even suspected that she had. The "fear of discovery" motive, therefore, was speculative at best, and

10

the additional probative value of the abuse evidence was thus extremely limited. On the other hand, the abuse evidence was devastatingly prejudicial and virtually certain to have a profound effect on the jury. Because of the Commonwealth's limited need for it and its overwhelming potential for prejudice, the abuse evidence posed an unacceptable risk that Tim would, in effect, be tried for an uncharged crime. In these circumstances the trial court abused its discretion by admitting the evidence of K. H.'s abuse. The jury's recommendation of the maximum penalty, moreover, suggests at the very least a reasonable possibility that the error contributed to the result. The error may not, therefore, be deemed harmless. Anderson v. Commonwealth, supra.

## B. Evidence of Tim's Prior Threats Against Lori and Channin was Admissible.

Because the issues could arise at a new trial, we may also note that otherwise the admission of evidence concerning the 1996 altercation with the Daughertys and the acts of intimidation against Lori was not an abuse of discretion. In Davis v. Commonwealth, we observed that

> [g]enerally, evidence of prior threats and animosity of the
> defendant against the victim is admissible as evidence of
> motive, intent, or identity.

147 S.W.3d at 722. Here Channin Daugherty and Lori were both victims of Tim's alleged crimes, and the evidence of his prior threats and violence toward them was sufficiently probative in both senses discussed above to justify admission. Several witnesses testified concerning Tim's anger, and the Commonwealth produced a recording of Channin's 911 call during the car chase, all of which made it abundantly reasonable for a juror to believe that the acts the victims described actually occurred. Those acts, moreover, again as noted above, were substantially probative of Tim's

11

state of mind during the car chase and during the first week of August 2005 while he continued his efforts to force Lori to return. They were also substantially probative of Lori's state of mind during that period, which, as the trial court correctly noted, is another element of stalking.

It is true, as Tim argues that several of the alleged prior acts occurred long before the summer of 2005, but we have several times observed that the temporal remoteness of an alleged prior bad act "bears more heavily on weight than on admissibility." Davis v. Commonwealth, 147 S.W.3d at 725. It was not unreasonable here for the trial court to conclude that evidence of both the 1996 incident with the Daughertys and the incidents with Lori contributed significantly to an accurate understanding of the events of July and August 2005. Indeed, evidence of the couple's history was reasonably necessary for the Commonwealth to meet its burden of showing that Tim's July and August acts were not simply those of an overwrought father trying to contact his children. The probative value of this prior bad acts evidence, therefore, sufficiently outweighed whatever tendency it may have had to characterize Tim as habitually angry and aggressive. The trial court did not abuse its discretion by admitting that evidence.

## C. The Reason Lori Objected to Tim's Attendance at the Pool Party Should Not Have Been Admitted.

We may note, finally, that an allusion to Tim's prior conviction should not have been admitted in conjunction with testimony regarding K. H.'s birthday party. As noted above, Lori testified that she objected to Tim's attendance at the party because she felt it inappropriate for him to be around adolescent girls. Tim contends that this allusion to his conviction for molestation improperly suggested to the jury an unspecified prior bad

act. We agree. At retrial, while the fact that Tim and Lori argued over Tim's attendance at the party is admissible to show the hostility that existed that day, Lori's reasons for objecting should be excluded.

## II. Tim was not Entitled to a Dismissal of the Stalking Charge.

Tim next argues that the stalking charge should have been dismissed for lack of evidence and excluded from the jury instructions. The General Assembly created the crime of stalking in 1992. Acts, 1992 c 443 § 1, (effective July 14, 1992). Where there is repetitive, threatening behavior, the stalking statutes are intended to allow for intervention before the victim has actually been attacked. In its current form, which was the version in effect at the time of Tim's alleged crime, KRS 508.130 defines "stalk" as follows:

> (1) (a) To "stalk" means to engage in an intentional course of conduct:
>   1. Directed at a specific person or persons;
>   2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and
>   3. Which serves no legitimate purpose.
>
> (b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

"Course of conduct," the statute continues,

> means a pattern of conduct composed of two (2) or more acts, evidencing a continuity of purpose.

Next, KRS 508.140 makes first-degree stalking a class-D felony and defines the offense, in pertinent part, as follows:

> A person is guilty of stalking in the first degree,
> (a) When he intentionally:
>   1. Stalks another person; and
>   2. Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:
>     a. Sexual conduct as defined in KRS 510.010;

13

b. Serious physical injury; or

c. Death; and

(b) 1. A protective order has been issued by the court to protect the same victim or victims and the defendant has been served with the summons or order or has been given actual notice.

To establish that Tim stalked Lori, therefore, the Commonwealth was obliged to prove (1) that after August 2, 2005, when Tim was served with Lori's protective order, he (2) intentionally threatened Lori, either explicitly or implicitly, so as to place her in fear of sexual contact, serious injury, or death, and that he intentionally stalked her, *i.e.* (3) that he engaged in a course of two or more harassing, annoying, alarming or intimidating acts directed toward her with (4) no legitimate purpose and which both (5) would have caused a reasonable person in Lori's position substantial mental distress and (6) did in fact cause Lori substantial distress.

The stalking charge was correctly presented to the jury if the evidence permitted a rational juror to believe all of these elements beyond a reasonable doubt. Commonwealth v. Benham, 816 S.W.2d 186 (Ky. 1991). Tim maintains, however, that there was insufficient evidence that after August 2, 2005 he either threatened Lori or subjected her to an intimidating or harassing course of conduct. We disagree. The statute requires no more than an implicit threat, and a rational juror could have believed that Tim's dire threats on August 6, 2005 against the Daughertys, which were conveyed to the Daughertys and to Lori by Ron Harmon, implicitly threatened Lori, as well as the Daughertys, with serious injury or death for her act of separation. There was ample evidence, moreover, that the course of intimidating conduct Tim began on July 31, 2005—the car chase, the harassing phone calls, the phone calls to family members and acquaintances, the use of surveillance to appear unexpectedly where Lori was, and the

14

removal of Lori's van—continued to and beyond August 2, 2005. In particular, a rational juror could have believed that Tim's continuing concealment of the van, his August 6 threat, his pestering Lori's family and acquaintances with phone calls threatening the destruction of Lori's property, and his ransacking of their residence and leaving a axe in Lori's bedroom, were all acts directed ultimately at Lori, were acts occurring, continuing, or communicated to Lori after August 2, 2005, and were harassing acts without legitimate purpose that would have seriously distressed a rational person and that did in fact distress Lori, particularly in light of her prior experience with Tim's temper. The trial court did not err, therefore, when it refused to dismiss the stalking charge.

### III. The Jury Instruction on Stalking was Reversibly Flawed.

Finally, Tim contends that even if a stalking instruction was appropriate, the instruction the trial court gave misstated the law and allowed for a non-unanimous verdict. The instruction—"Instruction No. 3, Stalking in the First Degree"—provided as follows:

> You will find the defendant, Timothy Paul Heil, guilty under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:
> (A) That in this county, between the 30th day of July, 2005 and the 12th day of August, 2005, the defendant:
>     (1) Intentionally stalked Lori Heil; AND
>     (2) Explicitly or implicitly threatened Lori Heil with the intent to place her in reasonable fear of sexual contact, serious physical injury, or death; AND
> (B) (1) That when he did so, he knew that a protective order had been issued against him by the Jefferson Family Court to protect Lori Heil from such conduct.

### A. The Jury Instruction did not Misstate the Stalking Statute.

Tim contends, first, that by directing the jury in part (A) to consider conduct

occurring prior to August 2, 2005, the instruction misstated the law that stalking must (under the facts of this case) follow notice of a protective order. Tim did not preserve this issue by making a timely objection at trial, and without a more fully developed record we are unable to say that the trial court erred in this regard at all, much less that it palpably erred. Part (A) merely tracked the indictment, which identified the period of time during which all of the alleged charges occurred. Part (B)(1) made it sufficiently clear that the stalking offense pertained only to that portion of the period following Tim's receipt of the protective order, and defense counsel's closing argument guarantees that the jury understood that point. Tim is not entitled to relief on this ground

## B. The Jury Instruction Permitted a Non-unanimous Verdict.

Tim also maintains that the instruction was flawed by permitting the jury to reach a non-unanimous verdict. This objection was properly preserved. The trial court's instruction was based upon the pattern First-Degree Stalking instruction in Cooper and Cetrulo, *Kentucky Instructions to Juries,* Fifth Edition, § 3.63 (2006). Part A. (2) of the pattern instruction provides that the defendant "explicitly or implicitly threatened [victim] with the intent to place [victim] in reasonable fear of [sexual contact] [(or) serious physical injury] [(or) death]." The pattern instruction thus expressly indicates that only those alternatives supported by the evidence should be included in the instruction as given. The trial court's instruction included all three alternatives.

As Tim correctly notes, under Ky. Const. § 7, a defendant cannot be convicted of a criminal offense except by a unanimous verdict. Burnett v. Commonwealth, 31 S.W.3d 878 (Ky. 2000). This Court has explained that

> a "combination" instruction permitting a conviction of the
> same offense under either of two alternative theories does
> not deprive a defendant of his right to a unanimous verdict if

16

there is evidence to support a conviction under either theory.
. . . Otherwise, the verdict cannot be shown to be unanimous
and the conviction must be reversed.

Miller v. Commonwealth, 77 S.W.3d 566, 574 (Ky. 2002) (citation omitted). Tim

contends that the combination instruction here violated his right to a unanimous verdict

because there was no evidence to support the theory that he threatened Lori with

sexual contact. We agree.

Indeed, while there was ample evidence in this case that Tim's anger had often

led to acts of property destruction and threats of violence and that after August 2, 2005

he had made a serious threat of injury or death against Lori, there was no evidence

whatsoever that Tim had ever subjected Lori to unwanted sexual contact or that he

threatened to do so during the events at issue. Even if the allegations regarding K. H.

had been admissible, moreover, those allegations in no way tended to show that Tim

had sexually threatened Lori. The sexual-threat "theory" of the case was nothing but

speculation. By including the unsupported sexual-threat stalking instruction, therefore,

the trial court violated Tim's right to a unanimous verdict, and because the denial of a

unanimous verdict generally is not subject to harmless error analysis, Burnett v.

Commonwealth, supra, Tim's stalking conviction must be reversed on this ground as

well.

## CONCLUSION

In sum, although Tim is not entitled to a dismissal of the stalking charge, his trial

was reversibly marred by the introduction of collateral and unduly prejudicial evidence

that he had abused his adopted daughter, and by the inclusion in the jury instructions of

an unsupported theory of stalking. We are obliged, accordingly, to reverse the January

17

25, 2007 Judgment of the Jefferson Circuit Court in its entirety and to remand for additional proceedings consistent with this opinion. Evidence that Tim abused his adopted daughter should not be admitted at a new trial, and unless the evidence includes proof of a sexual threat against Lori during the relevant period, the jury instructions should not include the sexual-threat theory of stalking.

All sitting. All concur

COUNSEL FOR APPELLANT:

Elizabeth B. McMahon
Assistant Public Defender
Office of the Jefferson District Public Defender
200 Advocacy Plaza
717-719 West Jefferson Street
Louisville, KY 40202

Frank Wm. Heft, Jr.
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Samuel J. Floyd, Jr.
Assistant Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, KY 40601-8204